**Fred FERRONE, Petitioner**

v.

**DEPARTMENT OF LABOR,**
**Respondent.**

**Appeal No. 86-696.**

United States Court of Appeals,
Federal Circuit.

July 28, 1986.

John Carney, Solerwitz & Leeds, Mineola, N.Y., for petitioner.

Terrence S. Hartman, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., for respondent. With him on brief, were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director and M. Susan Burnett. Michael J. Ward, Jr., Dept. of Labor, Washington, D.C., of counsel.

Before MARKEY, Chief Judge, NICHOLS, Senior Circuit Judge, and BISSELL, Circuit Judge.

NICHOLS, Senior Circuit Judge.

The respondent says this case is unique, and we agree, but it is likely of repetition. Petitioner, Fred Ferrone, formerly a criminal investigator for the Department of Labor (DOL), petitions from an initial decision of a Merit Systems Protection Board (MSPB or board) presiding official, sustaining an agency decision to remove him. The board refused to review it, making it final, 29 M.S.P.R. 185. The sustained ground was refusal to obey a lawful order of his superior to divest himself of an outside contract they viewed as creating a conflict of interest, contrary to an applicable regulation, 29 C.F.R. § 0.735–4. Ferrone believed, and still believes, the contract is a private and personal matter, for which reason he refused to divest. We agree with the DOL and the board and therefore affirm.

I

The case is regrettable, depriving the United States of a successful and valuable investigator on account of a dispute over a contract that never should have arisen. Ferrone and a partner, Wesley Walker, were investigators attached to the staff of the DOL Inspector General, a body created in 1978. In 1979 they commenced an investigation of labor racketeering at the Fulton Fish Market, New York City, at first unaided, but enlisting, as the case developed, the support of other federal agencies, notably the IRS, as well as the New York City police, all under the direction of Assistant United States Attorney Daniel Bookin, who has certified to the magnificent job done by Ferrone and Walker. By the close of 1983, racketeering at the Market was ended, 48 indictments had been obtained, with 44 convictions and 24 sentences. Especially long terms for the heads of the "mob" were obtained. Commendations and awards from Congress and from the press poured in on Ferrone and Walker, and the DOL welcomed newspaper publicity doing its agents ample justice, especially in view of the newness of the investigative unit. Many of our petitioners in MSPB cases are underachievers, here we have a striking example of the reverse.

In early 1984, writer Nathan Adams did a "Feature Condensation" about the case for Reader's Digest, which eventually appeared in the September 1984 issue under the title *Two Against the Mob*. There is no question of the propriety of Ferrone's conduct in assisting with this, as well as prior press stories. It is not seriously challenged that Ferrone and Walker first talked to Reader's Digest on instructions from above.

The contract in question is dated January 27, 1984, and the parties to it were Ferrone and Reader's Digest Entertainment, Inc. (RDE) a wholly owned subsidiary of Reader's Digest. A similar contract was made with Walker, but he divested as ordered and remains on the DOL payroll.

The contract is in three parts. The first is a letter agreement by which in consideration of payment of $2,000, Ferrone grants RDE an exclusive option to purchase Ferrone's motion picture, television, and allied rights

in and to your verbal life story, including all portions thereof pertaining to your investigation of racketeering at the Fulton Fish Market (the "Story") * * *. The option could be exercised at any time before February 1, 1985, and could be extended another year on payment of another $2,000 which in fact was paid. By paragraph 4, Ferrone represented and warranted that he was—

the sole and exclusive owner throughout the world of the Rights and have the right to grant the Rights exclusively to us [i.e., to RDE].

By paragraph 8 he agreed he would not, during the original option term or any extension thereof,

tell the Story or any part thereof or share same with any person other than us and our representatives.

By paragraph 9 he agreed that RDE might prepare manuscripts, treatments, etc., utilizing the Story, and also agreed

to consult with our designated representatives concerning the Story, to answer such representatives' questions, and generally to cooperate in the preparation of all written * * *.

The second part of the contract, the "Assignment," was activated in the event RDE exercised its option. It called for payment to Ferrone of $50,000 for a theatrical feature motion picture and other sums for other uses. Ferrone again represented he was sole owner of the Story, and he assigned all rights therein. He agreed to furnish "technical assistance" on terms to be negotiated, but RDE would have "complete control." The third part of the contract is called "Release," and it appears meant to release any possible liability for invasion of privacy.

Under date of February 2, 1984, the Office of the Inspector General issued a directive that any (of its own) employees then engaged or planning to become engaged in "outside employment, business, professional or other such activities" should apply for clearance if he had not already done so. A form for application was provided. Ferrone did not so apply.

An effort was made to show that the media, including RDE, already knew all they needed to know about the case, and the main interest was in Ferrone's private life. The presiding official made no finding as to this, and it would appear the contract itself, drafted by RDE, is the best evidence of what RDE wanted and expected to gain.

The evidence of Richard Ross, Ferrone's immediate superior, and of Ferrone himself, conflicted as to whether a practice existed of informal oral clearance of outside employment and, if so, whether Ross, properly informed, actually granted for this contract an oral clearance. Ferrone testified Ross said it was time Ferrone got something for himself out of all this and he hoped Ferrone had hired a lawyer to protect his interest. The presiding official gave Ferrone the benefit of the doubt as to these facts.

The Inspector General later got wind of the contracts and assigned other and independent agents to investigate. The facts were thus brought out. It appears that the new team had to obtain copies of the contracts from RDE by subpoena. The two agents were asked or directed to divest. Walker eventually did so, but Ferrone refused and still refuses. The presiding official found, and it is not denied, that the agency "went more than the last mile" to achieve some sort of accommodation, but that was not possible. On November 6, 1984, the Deputy Inspector General ordered Ferrone to divest by the close of business November 9. This he again refused, referring to his wife and family and writing—

It is my belief that my dealings with [RDE] are both a personal and a private matter.

I do not believe there is any conflict of interest or any violation of the Code of Conduct or OPM Regulations * * * the United States Government is going far beyond the scope of their authority and invading our personal lives.

The notice of proposed removal followed, giving two reasons, (1) breach of the Code

of Conduct, creating a conflict of interest, and (2) the November 9 refusal to obey a lawful order. The Inspector General's decision sustained both grounds, but the presiding official of MSPB sustained the second only, so the first may be considered out of the case.

There was testimony that there existed an agency grievance procedure that Ferrone could have invoked, so disobedience of the order as a mode of testing was called unnecessary.

## II

■ The government seems to argue here that, given the availability of the grievance procedure, the order should have been obeyed, even if illegal. The authority this court relies on is *Bigelow v. Department of Health and Human Services*, 750 F.2d 962 (Fed.Cir.1984) which excepts the case of an order illegal on its face. Mr. Ferrone clearly believes that the order he disobeyed was illegal. If it was perfectly proper, as we hold it was, that disposes of the illegality defense without the need to consider the somewhat speculative and inadequately briefed issue of whether the grievance procedure could have been relied on without irreparable injury if the order had been in fact invalid.

Ferrone certified to RDE that he was the exclusive owner of a story that it seems obvious belonged at least in part to the agency. He claimed the right to grant his own so-called exclusive rights to RDE excluding all others. He contracted not to tell the story to anyone other than RDE, not excepting his employer. He agreed to answer questions that would arise in preparation of a script. Unless the Inspector General's Office had no rights at all in the story, Ferrone agreed, for pay, to curtail its rights to benefit RDE. On the face of the contract, a plainer conflict of interest could not exist.

It is asserted there could be no real conflict because RDE already had all the facts of the investigation and only wanted details of Ferrone's personal life and that of his family. The MSPB did not so find, and it is contradicted by the contract itself. We do not see how anyone could believe that RDE might produce a documentary and need no help concerning the case from Ferrone; and anticipating such a need, they contracted with Ferrone to satisfy it. On the other hand, it is asserted that the official interest in the case was over as the criminal charges had all been disposed of. This, too, is not found, and it would have required great faith to find it. It is not possible a 4-year investigation produced no leads not still potentially of importance to law enforcement. Assuming no direct appeals of the 24 convictions were pending, we all know that a collateral attack can revive a criminal case at any time. It may have seemed unlikely, but who could be sure? If the contract terms were broader than RDE could possibly need, as Ferrone's arguments imply, his obstinacy, and his insubordination in refusing to consider any modification, are all the more striking. The agency is not interfering with his personal life in objecting to contract clauses so far as they relate to official business, as on their face they do, even if such clauses are unneeded for the things Ferrone now says the parties really intended.

[2] Real or apparent conflicts of interest are job related, and can engender sanctions against an employee. *Weston v. Department of Housing & Urban Development*, 724 F.2d 943, 949 (Fed.Cir.1983).

While the story of the Fulton Fish Market case has a large cast of characters, Ferrone seems to maintain that it belongs exclusively to him. Assertion of such ownership, unless the employing agency acquiesces, causes a natural conflict of interest so far as it is adverse to the agency's claims. In denying the existence of a conflict of interest, because it all belongs to him, Ferrone establishes more clearly that there is one. It would no doubt often be better for the agency to establish beforehand, by rule or by contract with its investigators, just who has what rights in the dramatic stories that often arise out of criminal investigation, but for purposes of the present case where the investigator

denies the agency has *any* interest at all, more is not necessary.

### III

The board's holding is, essentially, that proper subordination to the requirements of the agency is intrinsic to the necessities of the service. The insistence of the agency on keeping its hands on the story is found justified by its need to maintain good relations with other investigative agencies, especially the IRS and the New York City police. It feared, the board found, that "a one-sided presentation would adversely affect the agency's working relationship with sister law enforcement agencies," which shared in developing the case. No one who has ever had anything to do with federal investigative agencies can underrate the importance of this factor. Agencies are so numerous (Treasury alone has four and once had six), and the jurisdiction of each (except for the FBI), so limited that, oftener than not, a big criminal case will require the cooperation of two or more. If one thinks another is grabbing more than its proper share of acclaim for a successful outcome, future cooperation is endangered and investigators come to feel in their bones that the rival agency, not the criminal, is the true enemy.

In this case, apparently the spate of publicity was deferred until the trials were over, and thus the concern about jeopardizing a fair trial was not a factor, and is not mentioned in the presiding official's decision. Obviously, however, this concern must always be respected, and by prosecutors no less than defendants, because an otherwise effective prosecution may be spoiled if publicity has jeopardized a fair trial. The Justice Department now has, and long has had, rules about what prosecutorial publicity is permissible, and when. 28 C.F.R. § 50.2. This concern must bear on the notion that investigators have exclusive property rights in the story of their own investigations; if they do, such rights must spring into existence long after the investigations themselves are complete, and someone other than the participant must decide when.

The Freedom of Information Act, 5 U.S.C. § 552, embodies in section (b)(7) an exemption for investigative reports compiled for law enforcement purposes, reflecting congressional acceptance of the need that such reports be confidential. This confidentiality would be thwarted if investigators could sell the story of their investigations to the highest bidder, who then could print them under safeguard of the first amendment.

■ On the whole, it appears that the legal relationship of government investigators to the story of their own investigations is one of an obligation to keep the lip buttoned, until the proper authorized time and place, rather than one of a right to exploit dramatic histories by sale of stories to the media at the investigator's option.

### IV

The decision under review fully recognized the right of the accused employee to have the board's independent consideration of factors that might mitigate the penalty the agency imposed. *Douglas v. Veterans Administration*, 5 MSPB 313, 5 M.S.P.R. 280 (1981). Here the MSPB considered the higher standard of conduct and discipline to which a criminal investigator is subject, the efforts of the agency to "salvage the situation and rehabilitate the appellant" by providing a face-saving way out, the fact that the partner, Walker, took advantage of the opportunities afforded and was still on the payroll, that the refusal by Ferrone to obey a lawful order was "defiant and contumacious," and that the agency "went the last mile" because it wanted to retain Ferrone as an agent also, being aware of his fine record. But, the board says " * * * no government organization, much less a para-military one dedicated to law enforcement, can tolerate insubordination." (Possibly the force to which Ferrone belonged was para-military because an Inspector General headed it.) Here, however, we may make express what is implicit in the board analysis, that to reinstate Ferrone, at once or

after a suspension, still defiant and still refusing to do what the agency ordered, would be tantamount to a total victory for the forces of insubordination. Insubordination is not destructive solely to the military. We consider that this is sufficient analysis under the *Douglas* factors, the board not being required to tick off the factors mentioned in *Douglas,* but here irrelevant, reduced to irrelevancy by the factors mentioned. *Nagel v. Department of Health and Human Services,* 707 F.2d 1384, 1386 (Fed.Cir.1983).

The criminal investigator for a federal agency has often, as here, contended with the most dangerous and ruthless kind of opponents, with the support of inadequate resources on the part of his own organization, and uncertain cooperation on the part of others. Any beginning associate in a large New York or Washington firm is paid better than he is, yet he must remember legal rights when the bullets are flying about his head. He must display personal courage, resourcefulness, initiative, persistence, patience, a contempt for regular hours, and a full set of intuitions. Above all, he must be lucky. Often, as with Ferrone and Walker here, he may have the full force of the law behind him in theory, for whatever that is worth, but the apparent reality is a pair of Davids alone against platoons of Goliaths, and Goliaths much smarter than the Biblical original. If he represents the law, he often sees it as taking the side of his opponents with respect to critical issues. He must suffer a good deal of abuse and some overt contempt. Usually he tries to do right, and often succeeds, but it is small matter for wonder if occasionally he goes off the deep end. When he does, it is for such a case the compassionate *Douglas* factors were created. Were we not satisfied the agency and the MSPB had applied them here for all they were worth, we could not affirm as we do.

### Conclusion

The decision of the MSPB in the instant case, being found not arbitrary, not capri-

cious, not contrary to law, not an abuse of discretion, but correct as to procedure and supported by substantial evidence, is affirmed.

AFFIRMED.